UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KENNETH COLVIN, JR. #192744, and
GEORGE BETTS #145197,

    Plaintiff,

v.

    Case No. 2:16-CV-202

    HON. GORDON J. QUIST

DUNCAN MacLAREN, CECIL DALEY,
ALEX VERT, AND JERRY HARWOOD,

    Defendants.
_____/

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## Jurisdiction

Plaintiffs, Kenneth Colvin, Jr., and George Betts, prisoners currently incarcerated with the Michigan Department of Corrections (MDOC), sued Defendants, Duncan MacLaren (Warden), Cecil Daley (Deputy Warden), Alex Vert (Lieutenant), and Jerry Harwood (Deputy Warden) from Kinross Correctional Facility (KCF). Plaintiffs claim that Defendants violated their First Amendment rights by retaliating against them for their participation as block representatives in the Warden's Forum and, in Plaintiff Colvin's case, for writing a grievance related to his position as block representative. Plaintiffs allege that they faced adverse action when they were transferred abruptly without being able to pack their belongings, which resulted in a transfer to a facility that the Plaintiffs claim was a "disciplinary facility" and damage to their belongings. Plaintiffs bring their claims under 42 U.S.C. § 1983, and the Court has jurisdiction pursuant to 28 U.S.C. § 1331.

A bench trial was held on June 19, 2019, wherein the Court heard testimony from both Plaintiffs and all Defendants.

**Findings of Fact**

At KCF, Defendant MacLaren hosted a monthly Warden's Forum meeting, wherein prisoners who were elected as block representatives could bring to the administration's attention issues that the prison population was experiencing. In late March 2016, the Warden's Forum met to discuss issues that precipitated a peaceful demonstration earlier that month. At that meeting, Defendant Daley also asked block representatives for a daily report of prisoners' issues so that he could address them in between the Warden's Forum meetings. Plaintiff Colvin testified that issues brought to the Warden's Forum and to Daley were listened to and resolved.

The prisoners from each block were able to elect two representatives to attend the Warden's Forum on their behalf. Once a member of the Warden's Forum, block representatives were then assigned to various committees. In March 2016, Deputy Warden Mastaw[1] informed the Block Representative Chairman, a prisoner by the last name Jones, that Colvin could no longer serve on the Food Service Committee because Colvin participated in a religious, Kosher diet that would not allow him to test the proposed menu items, which was one of the primary duties of members of the Food Service Committee. As such, he would simply be assigned to a different committee. Colvin wrote a grievance against Mastaw, MacLaren, and others regarding that decision on March 31, 2016, and the grievance was received by the grievance coordinator on April 1, 2016. Daley responded to the grievance on April 11, 2016. (Pls.' Trial Ex. 14, ECF No. 112 at PageID.872.)

---

[1] Deputy Mastaw was never referred to by first name but was referenced in oral testimony and in Plaintiffs' Trial Exhibit 14 (ECF No. 112 at PageID.872).

On April 4, 2016, John Huhtala, an inspector at KCF, emailed MacLaren regarding the possible transfer of prisoners who were considered security risks. In order of importance, Huhtala listed ten prisoners and included some limited information about why he considered them security risks if they remained at KCF. (Defs.' Ex. F, ECF No. 122 at PageID.1013.) Plaintiff Betts was number three on the list and the reason given for the recommendation to transfer him was that he was a "Wardens [sic] Forum member instrumental in recruiting and enforcing for the Demonstration." (*Id*.) Colvin was number four on the list and the reason given for him was that he was a "Wardens [sic] Forum member who was and is involved in trying to recruit for another demonstration." (*Id*.) This information was primarily based on anonymous kites received from other prisoners warning of an upcoming prisoner demonstration that would likely be larger than the previous demonstration and possibly violent, but Huhtala gathered additional information about the upcoming demonstration during his investigation of the kites.

Based on Huhtala's recommendation, MacLaren requested the transfer of five prisoners out of KCF. He sent information to the Correctional Facilities Administration (CFA) in Lansing, the agency responsible for approving transfer requests. CFA approved the requests and arranged transfer of the five prisoners to five different facilities. Per the transfer requests for Betts and Colvin, they were to be transferred to an alternate Level II facility, the same security level they had at KCF, but no Defendants chose or had input as to the specific facilities to which Plaintiffs and others were sent. Daley and Defendant Harwood, as deputy wardens, regularly review transfer orders for completeness and sign if the orders include all the necessary information. Daley signed Colvin's transfer order, and Harwood signed Betts's transfer order.

Colvin and Betts were transferred in the early morning of April 7, 2016. Because the purpose of their transfer was for security concerns, Colvin and Betts were not given advanced notice of their transfer or an opportunity to pack their belongings. MacLaren truthfully explained that if prisoners are being transferred for non-security reasons, they are told of the transfer the night before to give them an opportunity to pack their belongings. However, if prisoners are transferred for security reasons, they are not told the night before because that could pose a security risk for the night-shift staff. Particularly in this instance, when Huhtala had informed MacLaren that Colvin and Betts were potentially involved in planning a violent demonstration, informing Colvin and Betts of a transfer could have allowed them to set their plans into motion or appoint other prisoners to carry out their plans after their transfer. While MacLaren, Daley, and Harwood did not believe that they had enough information about the upcoming demonstration to warrant issuing a misconduct, removing Betts and Colvin from the prison yard, or changing their security classifications, the information from Huhtala justified proactive steps, such as a transfer under particular conditions, to avoid a future demonstration. Thus, Colvin and Betts were handcuffed and escorted to the control center at approximately 4:30 a.m. on April 7, 2016, and, only after arriving at the control center, they were informed that they were being transferred.

Colvin was escorted to the control center by Defendant Vert, and Betts was escorted by an unknown officer who was not named as a Defendant in this case. Pursuant to prison policy, Vert ordered another officer to secure Colvin's property to avoid theft. Normal practice is to place property in bags after it is secured and move it to the day room. Then, the property is transferred to the property room to be inventoried and packed for transfer. Other than Vert giving the order

to secure Colvin's property, none of the Defendants was involved in the transfer of either Plaintiff's personal belongings.

Betts was transferred directly to Oaks Correctional Facility (ECF). He did not receive his property for seven days. He was stripped of some of his property because the list of approved personal items was more restrictive at ECF. Some of his appliances were not working when he plugged them in. Importantly, his typewriter was broken, but because of MDOC's policy on depreciation and repair of items, he was not able to get his typewriter repaired and would only have received minimal compensation ($15-30) for the broken typewriter to put toward buying a new one.

Colvin was first transferred to Saginaw Correctional Facility (SCF), but because SCF could not accommodate his religious diet, he was subsequently transferred to ECF. He received his property five days after leaving KCF. The officer that received Colvin's property noted that multiple items were in disarray, the typewriter was broken, and the information on the packaging was incomplete (*e.g.* did not include Colvin's name and number, was signed illegibly, etc.). Colvin complained of his typewriter being broken, but again, per MDOC policy, he could only receive $15 in compensation for the broken typewriter.

Ultimately, both Colvin and Betts were sent to ECF. Both testified that they considered ECF a disciplinary facility because it had an earlier time that prisoners had to go to bed and because movement was more restricted than at KCF. However, they acknowledged that they were sent to the Level II units at ECF, which was the same security classification as their former units at KCF. They wrote grievances claiming that they were retaliated against in the way in which they were

transferred—without the opportunity to pack their belongings—and for the damage to their typewriters. Their grievances were denied.

## Conclusions of Law

Retaliation based upon a prisoner's exercise of his constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). To establish a First Amendment retaliation claim, a plaintiff must prove that: (1) he engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* A plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977)). Moreover, to succeed on a § 1983 claim, a plaintiff must prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948 (2009); *see also Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) ("[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a mere failure to act.") (internal quotation marks omitted).

Defendants concede that Plaintiffs participation in the Warden's Forum and Colvin writing the grievance regarding his removal from the Food Service Committee constitute protected conduct under the First Amendment. Plaintiffs allege that they suffered adverse action when they were transferred to ECF and when their typewriters were damaged. However, neither allegation sufficiently supports a First Amendment retaliation claim.

*Transfer*

Plaintiffs claim that their transfer was in retaliation for their protected activity, but transfers to another prison facility can only constitute adverse action in limited circumstances. According to the Sixth Circuit, "since transfers are common among prisons, ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct." *Siggers-El v. Barlow*, 412 F.3d 693, 701 (6th Cir. 2005). A narrow exception applies when there are foreseeable consequences to the transfer that interfere with the prisoner's ability to access the courts. *Id*. at 702.

Plaintiffs argue that the manner of their transfer led to the foreseeable consequence of damage to their belongings, but that argument has two problems. First, an allegation regarding damage to personal property is not related to access to the courts, and thus does not fall under the narrow exception. Second, "[o]nly those consequences that inextricably follow from a defendant's alleged retaliatory conduct . . . would be considered in determining whether the plaintiff suffered an adverse action." *Id*. Under MDOC policy, for a prisoner who is transferred in the manner that Plaintiffs were transferred, his property is secured to prevent theft. Vert, the only Defendant involved in any part of the transfer of Plaintiffs' property, ordered another officer to secure Colvin's property. Plaintiffs do not allege that their property was stolen but that their property was damaged in the transfer. That is not a consequence that inextricably follows from Defendants' actions in initiating and facilitating Plaintiffs' transfers to alternate facilities.

Plaintiffs also argue that they were transferred to a "disciplinary facility." However, as Plaintiffs conceded, they were transferred to another Level II facility. While there may be some differences in the way the destination facility operates, that does not convert a routine transfer into

adverse action. Furthermore, Defendants did not decide to which facilities Plaintiffs would be sent. They merely requested a transfer to another facility at the same security classification level.[2] Moving to a more restrictive environment does not render the transfer adverse action.

Even if Plaintiffs could show that the transfer was an adverse action, they fail to prove a causal connection between their protected conduct and the transfer. Transfers for operational needs, such as to prevent disciplinary issues, cannot be in retaliation for the exercise of protected conduct. *Id.* Plaintiffs contend that the information that Defendants relied upon for determining that Plaintiffs posed a security threat was inaccurate because Plaintiffs maintain that they were not involved in planning the prior demonstration or any future demonstration. However, it does not matter if the information that Huhtala provided to Defendants was entirely accurate; what matters is that Defendants relied on the information they had before them in initiating the transfers.

### *Damage to Typewriters*

The Court finds that Plaintiffs' typewriters were damaged and that MDOC employees were responsible for the damage, which could constitute an adverse action. Unfortunately for Plaintiffs, though, they cannot seek redress through a § 1983 claim because they cannot show that the adverse action was motivated by the protected conduct or that Defendants, through their own individual actions, violated the Constitution. As discussed earlier, other than Vert giving the order to secure Colvin's property, Defendants were not involved in the actual transfer of Plaintiffs' personal property. The damage to the typewriters was not a result of Defendants' individual actions and was not motivated by Plaintiffs' protected conduct. Thus, Plaintiffs cannot sustain a § 1983 claim against these Defendants.

---

[2] It is also worth noting that Colvin was not sent to ECF directly. He was sent to SCF, and it was only when SCF realized that it could not accommodate his religious diet that Colvin was sent to ECF.

## **Conclusion**

Plaintiffs have failed to prove that their First Amendment rights were violated. An appropriate judgment will enter.


Dated: June 28, 2019                               /s/ Gordon J. Quist
                                                              GORDON J. QUIST
                                                     UNITED STATES DISTRICT JUDGE